REBECCA WILSON v. ANNA WILSON and KATE M. WILSON; ANNA WILSON, Appellant.

Division One, April 2, 1914.

1. **FRAUDULENT CONVEYANCE: Shown by Attachment Sustained.** An attachment brought by creditors, attacking a deed as having been made to hinder and defraud creditors, may be sustained on the ground of legal, and not actual, fraud, and though it results in a judgment sustaining the writ, it does not establish the fact that the deed, as between the parties thereto, was fraudulent.

2. **EQUITY: Appellate Practice.** In equity cases, the appellate court will defer somewhat to the findings of the trial court, who has the advantage of seeing and hearing the witnesses and observing their manner and demeanor on the witness stand; but it reserves the right, according to ancient usage, to make a finding of facts itself and to render such a decree as justice requires.

3. **FRAUD: Voluntary Conveyance of Farm.** The mother had indorsed the notes of her son, who had failed in business, and in order to raise money to pay his debts conveyed her $7000 farm to her daughter, who was more experienced with the world, and who borrowed $4000 with the farm as security and used the money to pay the debts. Thereafter the daughter executed a second deed of trust to secure to her mother and sister the payment of $1635, which she had agreed to pay them for their stock on the farm, and then conveyed a two-thirds interest in the farm to her mother and sister, subject only to the payment of the $4000 deed of trust, all of them, in pursuance to the advice of a mutual friend who was an experienced banker, executing a concurrent written contract by which all of them were to live on the farm, cultivate it, and use the proceeds to pay off the $4000 mortgage, and on the sale of the stock and farm the grantee was to be reimbursed to the extent of $1871 for money she had expended on the farm since it had been conveyed to her. The net result of the agreement, if carried out, would be to leave her one-third interest incumbered for the $1635 note, and her mother's and sister's two-thirds free and clear of liens. *Held,* that there is nothing in the face of the transaction to indicate fraud or overreaching on the part of the grantee of the deed; and her mother and sister, with full knowledge, and in the presence of a friend to advise them, having entered into a subsequent contract by which, upon the pay-

ment of the stock note for $1635, they agreed to surrender that note and relinquish to her all claim to their two-thirds interest in the land, there is no such fraud as authorizes a court of equity to interfere.

5. ———: ———: Ratification: Change in Situation. Where it is claimed that the original conveyance of land was the result of overreaching by a shrewd daughter with her mother who it is claimed was unable to understand English and therefore the contract, a subsequent contract, was procured by fraud, whereby the first transaction is ratified, entered into by them, without any fraud or deception and with full understanding on the mother's part, and after the situation had materially changed, will bar the cancellation of the conveyance.

Appeal from Benton Circuit Court.—*Hon. C. A. Denton,* Judge.

REVERSED.

*W. S. Jackson* and *Henry P. Lay* for appellant.

(1) The deed sought to be set aside having been made for the purpose of defrauding, hindering and delaying plaintiff's creditors, it cannot be set aside at her suit. Cramer v. Bivert, 214 Mo. 473; Derry v. Fielder, 216 Mo. 176; Pomeroy's Equity (1 Ed.), secs. 397, 398, 404. (2) If the petition and evidence show any cause of action, it is to enforce an express trust to reconvey the land; as such trust rests wholly upon parol evidence it cannot be enforced. R. S. 1909, sec. 2868; Heil v. Heil, 184 Mo. 665; Hillman v. Allen, 145 Mo. 638; Green v. Cates, 73 Mo. 115. An express trust is one arising from an agreement between the parties, as to reconvey land. 28 Am. & Eng. Ency. Law (2 Ed.), 882; Hillman v. Allen, 145 Mo. 638; Heil v. Heil, 184 Mo. 665; Green v. Cates, 73 Mo. 115. The mere fact that an express trust is not evidenced by writing will not convert it into a resulting trust. Heil v. Heil, 184 Mo. 675. (3) The plaintiff being *sui juris* she cannot release herself from the effect of the contract of November 15, 1909, and the receipt and release of December 1, 1909, by the plea that she did not read

and understand them before she signed them; she having had a full opportunity to read and have them explained, and no concealment, trick or misrepresentation having occurred. Crim v. Crim, 162 Mo. 544; Kellerman v. Railroad, 136 Mo. 177; O'Bryan v. Kinney, 74 Mo. 125. (4) If a voidable contract is voluntarily acted on, with a knowledge of all the facts, in the hope that it may turn out to the advantage of one who might have avoided it, she may not avoid it, when after abiding that event it has turned out to her disadvantage. Kerr on Fraud and Mistake, 296-302; Pomeroy's Equity (1 Ed.), secs. 817, 818, 820; Quinlan v. Keiser, 66 Mo. 603; Kronenberger v. Binz, 56 Mo. 121; Mormon v. Walker, 53 Mo. App. 614; Murdock v. Lewis, 26 Mo. App. 244. (5) Compromise agreements are favorites of the law. Wood v. Telephone Co., 223 Mo. 565; Reiley v. Chouquette, 18 Mo. 226. (6) Plaintiff cannot avoid her deed and contracts with the appellant without placing the appellant *in statu quo*; she cannot retain all the benefits derived from the transactions and avoid the obligations incurred. Feld v. Investment Co., 123 Mo. 603; Robinson v. Siple, 129 Mo. 208; Sachleben v. Heintz, 117 Mo. 520. (7) Upon discovering the alleged fraud in the procurement of the deed it was plaintiff's duty to take prompt steps to rescind it if she desired so to do; having failed to do so and having continued to deal with the defendant concerning the property, and permitted the defendant to contract obligations, and expend money and labor upon the land relying on said deed, she cannot now avoid it. Sachleben v. Heintz, 117 Mo. 529; Taylor v. Short, 107 Mo. 384; Wood v. Telephone Co., 223 Mo. 537.

*T. C. Owen* and *George F. Longan* for respondent.

Where one who reposes confidence in another, has been induced by the fraudulent misrepresentations of

the latter to attempt the perpetration of a fraud, the two are not *in pari delicto*, and as between them the rule in favor of the possessor cannot be invoked to prevent equity from interfering on behalf of the former. Poston v. Balch, 69 Mo. 115. "Where the executing of a contract has been procured by taking a fraudulent advantage of the maker's distressful situation, a court of equity will afford relief by setting aside the contract." Lappin v. Crawford, 186 Mo. 462; James v. Groff, 157 Mo. 402; Holliday v. Holliday, 77 Mo. 392. Whenever two persons stand in such relation that while it continues, confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is possessed by the other and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the one availing himself of the position will not be permitted to retain the advantage although the transaction could not have been impeached if no confidential relation existed. Martin v. Baker, 135 Mo. 495.

WOODSON, P. J.—The plaintiff instituted this suit in the circuit court of Benton county against the defendants to have a certain deed conveying certain lands described in the petition to the defendant Anna Wilson, and certain contracts executed in connection therewith, set aside and cancelled upon the alleged grounds of fraud and undue influence of the defendant Anna Wilson.

The trial resulted in a decree setting aside the deed and adjusted the rights of the respective parties to the suit. In due time the defendant Anna Wilson appealed the cause to this court.

The decree, as in most equity cases, turns upon the facts presented, rather than upon questions of law applicable thereto.

There being somewhat of a conflict between the contentions of the respective parties as to the purposes each had in view, and the evidence introduced tending to establish the respective theories advanced, there is a call for an extended review of the testimony outside of the documentary evidence introduced.

In order to simplify the issues and abbreviate the evidence as much as possible, I will first state the undisputed facts, and thereafter state the substance of the testimony giving color and character to the transactions.

Regarding the first: The plaintiff was a widow, and the mother of the defendants and four other children, one named Louis Wilson. She was a native of Germany and had lived in Benton county ever since 1858, some fifty-six years, and at the time of the trial of this cause she was sixty-nine years of age. While she could not read English, as her testimony shows, yet she understood it better than the average foreign-born person residing in this country.

For many years she had owned a valuable farm of one hundred and fifty-nine acres, valued at from $6000 to $7000, located in Benton county, the land in controversy.

The plaintiff and the defendant Kate M. Wilson were living on the farm, and the defendant Anna had for several years been a trained and professional nurse, residing at Sedalia and Kansas City, Missouri.

The son, Louis, for some years had been engaged in the mercantile business in a near-by town, and had failed in business, owing several thousand dollars to wholesale merchants throughout the country, for which his mother, the plaintiff, was security. Being pressed for payment and being unable to meet the same, the creditors instituted attachment suits and attached the land mentioned, for the reason alleged, that it had been

previously thereto, to-wit, March 3, 1906, conveyed by respondent to appellant for the purpose of hindering, delaying and defrauding creditors. But this conveyance, if I correctly understand the record, was made prior to any of the troubles that arose out of Louis Wilson's indebtedness, for much of the evidence tended to show that it was made to secure money to pay debts she owed prior to that time, but that is not made perfectly clear, for there is some evidence to the contrary.

But be that as it may, from the views we take of the case it is immaterial whether the deed was made on account of Lewis's debts or on account of those of other parties, or both, for which the respondent was security.

The attachment suits were tried and sustained, and thereupon negotiations began between the plaintiff, the mother and the daughters, by which the money for the payment of the indebtedness of the son, Louis, could be raised.

Shortly after this, Anna Wilson, one of the defendants, borrowed $4000 from one Davis, for the purpose of paying said indebtedness, and secured the same by giving a deed of trust upon the farm, the title of which, as previously stated, had been conveyed to her by her mother.

After securing this loan and the creditors having been paid, Anna Wilson and her mother went to the Osage Valley Bank in Warsaw and had Mr. Gallagher, the cashier thereof, to draft the following contract:

Warsaw, Missouri, May 21, 1908.

It is hereby agreed that the deed of even date herewith to 159 acres, the southeast quarter of section No. twenty-two, township No. forty-one, range No. twenty-one, except one acre heretofore sold to Louis W. Wilson, given to Rebecca Wilson and Katie M. Wilson, conveying an undivided two-third interest in said 159 acres, shall be held by the Osage Valley Bank, of Warsaw, Missouri, until the indebtedness of $4000 now against

said 159 acres be fully paid and satisfied. Also that Anna C. Wilson shall apply all the net proceeds from said 159 acres to liquidate the indebtedness thereon, and when said debt is fully paid and satisfied, then the Osage Valley Bank shall deliver the deed above mentioned to grantees therein or their legal representatives.

Nothing in this agreement shall be held to hinder Anna C. Wilson from investing proceeds until such time as it is deemed proper to apply same on debt, but that faithful account shall be kept of such proceeds, and they shall, in due time, be paid on the debt.

It is also understood and agreed that the net proceeds of the sale of the stock now on hand, and their increase, shall be applied to liquidate above mentioned debt, except that sufficient money shall be kept from sale of stock to pay Mrs. Rebecca Wilson $841 and Kate M. Wilson $794, due them and secured by second deed of trust on said 159 acres, and Anna C. Wilson shall be entitled to the sum of $1871 out of the sale of stock and proceeds of said 159 acres, this being the amount of money she has put into the place since she took charge of same.

All said amounts to draw six per cent interest, without compounding.

Mrs. Rebecca Wilson is to have the use of a horse or team to go to church at any time she desires.

Anna C. Wilson,<br>
Katie M. Wilson,<br>
Rebecca Wilson,<br>
W. H. Gallagher,<br>
Cashier.

This contract, as indicated by the signatures thereto, was signed by the plaintiff, the defendants and W. H. Gallagher, the cashier of the bank.

In pursuance to said contract, Anna Wilson, by deed, duly conveyed a two-thirds interest in the land to her mother, Rebecca Wilson, and the defendant Katie M. Wilson, which by the terms of the contract, was to be held by the bank until said indebtedness of $4000 should be fully paid.

On November 15, 1909, the plaintiff and defendants, at the request of the former, returned to said bank and had the following contract drawn and executed, abrogating the first contract, previously set out, viz.:

Warsaw, Mo., Nov. 15, 1909.

This agreement made and entered into this 15th day of November, 1908, by and between Anna C. Wilson, party of the first part, and Rebecca Wilson, and Katie Wilson, parties of the second part:

Whereby the said party of the first part agrees to pay the said parties of the second part the sum of sixteen hundred and thirty-five dollars ($1635), on the 1st day of December, 1909, and the said second parties agree to turn over to the said first party the notes held by them made by said first party, and secured by a second mortgage on 159 acres, being the southeast quarter of section twenty-two, township forty-one, range twenty-one, except one acre heretofore sold to L. W. Wilson; also to turn over an agreement covering a deed to two-thirds interest in above described land, and relinquish all claims to said described land, also to not in any wise interfere with said first party during the time said second parties occupy the house on said first party's property, and to give peaceable possession to said house on the first day of April, 1910, and said second parties to turn over the premises in as good condition as they are at this time, reasonable wear and depreciation excepted.

Said second parties are to keep no stock on said first party's premises, except one milk cow.

Signed, sealed this 15th day of November, 1909.

Anna Wilson,

Party of the 1st Part.

Rebecca Wilson,  '

Katie Wilson,

Parties of the 2nd Part.

Subscribed and sworn to, etc.

On December 1, 1909, in pursuance to the latter contract the defendant Anna Wilson paid to the plaintiff, her mother, and to the defendant, Katie Wilson, said $1635, mentioned therein, and they acknowledged the receipt of the same on the back thereof in the following words:

"We hereby acknowledge full satisfaction above mentioned and relinquish all claims to land and all stock and implements on said farm."

Signed by Rebecca Wilson and Katie Wilson.

Eighteen days after the payment of this $1635 to them, the plaintiff brought this suit.

The oral evidence introduced for the respective parties is very voluminous, and for convenience we will consider it in connection with the various propositions discussed.

I.   It is first insisted by counsel for appellant that the deed assailed in this suit, dated March 3, 1906, made by the respondent, conveying the farm to appellant, was executed by her for the purpose of hindering, delaying and defrauding the creditors of Louis Wilson, for which she was surety.

**Deed to Defraud Creditors.**

While appellant introduced some evidence tending to establish that fact, yet there was just as convincing evidence introduced by respondent, to show that she had no such intention, but made it for the purpose of placing the title to the land in the name of the appellant, in order that she might borrow money thereon, to meet prior obligations, and secure the same by a deed of trust thereon, the evidence tending to show she was in a better position to borrow the money than the respondent was, because of her financial standing, business knowledge and acquaintance with business men.

While the direct evidence regarding what was said and done by the parties leading up to the execution of the deed by respondent conveying the farm to appellant is very meagre, because executed in connection with other transactions prior to the existence of those that gave rise to this litigation, and therefore not specially material here, yet when we consider the undisputed facts in the case and the evidence throwing sidelights upon them and what the parties did regarding the land after it was so conveyed to appellant, it is sufficient to justify the finding of the chancellor, that the conveyance was not made for fraudulent purposes.   If that had been the purpose, why, after the new complications arose regarding Louis Wilson and his indebted-

ness, were the contracts of May 21, 1908, and November 15, 1909, executed? It seems to me that if the conveyance was made for the fraudulent purpose of defrauding respondent's creditors, then the parties thereto, when the attachments were sustained and their design thereby frustrated, would have proceeded in a more practical way than they did, as shown by this record, especially when we consider that it was done under the advice of a shrewd and able business man, Mr. Gallagher; but if made in good faith for the purpose of enabling appellant to borrow money upon the land, then I can readily understand why she would want to keep her agreement with her mother and adopt this or some such scheme by which she could accomplish that purpose, and at the same time protect and indemnify herself against all loss she might sustain on account of the undertaking, and at the same time preserve the interest of all the parties, herself included, in the equity or surplus of the farm remaining, after the payment of the $4000 deed of trust.

This plan was in perfect harmony with the idea that the conveyance was made in good faith, as respondent's evidence tended to show.

If this were not the real intention and purpose of the parties in executing the deed mentioned, but was designed as a scheme to defraud creditors, then of course a court of equity would not relieve the respondent of her own fraud, but would leave the parties where they placed themselves.

But as previously stated, I do not believe from this record, that this was their purpose, but that it was an honest attempt to procure money through the daughter, on the land, to pay the mother's debts, then existing.

Impressed with these views of the record, I am satisfied that the chancellor was fully warranted in finding that the deed of March 3, 1906, conveying the

farm to Anna, *as between themselves,* was a bona-fide transaction, notwithstanding the attachments, which may have been sustained upon the ground of legal and not actual fraud; and so believing, I am of the opinion that the evidence warranted the finding of the chancellor that the deed as between the parties was not fraudulent.

II. The second proposition to be determined is more complicated, not so much from the evidence in the case, as from the unusual charges and contentions made by the parties regarding the character of the various transactions under consideration.

As seen from paragraph one of the opinion, the appellant contends that the deed of March 3, 1906, of her mother, conveying the land in question, was executed to respondent's creditors, and therefore the respondent was not entitled to a recovery in this case, which contention was there decided against her. Upon the other hand, the respondent contends, if I correctly understand counsel, that while said deed of March 3, 1906, was executed by her in good faith, conveying the title to the land to the appellant in order to enable her to raise the money required to pay debts, yet the latter from the beginning had a fraudulent design to cheat and defraud, not only the creditors, but also her mother, the respondent, and resorted to the scheme mentioned in this record for that purpose.

While both appellant and respondent seem to be blowing hot and cold, from a critical examination of the record it is clearly apparent that the wind is from the spleen only, and is not borne out on either side by the evidence.

So these charges and countercharges or contentions but confuse the real facts and legal propositions presented by this record, and for that reason we will put them aside as far as possible, and consider the

case.as presented by the evidence preserved in the record.

Appellant insists that even though it should be conceded that the deed of March 3, 1906, was executed in good faith by her mother, the respondent, still she was not entitled to a recovery in this case, for the reasons that overwhelming evidence shows that she perpetrated no fraud whatever upon the mother, but acted in the utmost good faith, at great personal sacrifice, to preserve the old homestead for her and the other parties interested, subject to the deed of trust of $4000; and that in pursuance to that design the contract of May 21, 1908, after full consideration and understanding of all the parties, under the counsel and advice of an able and impartial friend of all concerned, was fairly and honestly executed by all the parties with no thought or intention on the part of the appellant of wronging or injuring anyone.

After reaching the conclusions stated in paragraph one of the opinion, which are in respondent's favor, there is no escape from this insistence of appellant, if the evidence introduced sustains her contention that the contracts of May 21, 1908, and of November 15, 1909, were in good faith executed by the parties thereto.

Since the appellant is assailing the correctness of the chancellor's findings and the soundness of the decree rendered by him, we will first review the evidence introduced by her throwing light upon those contracts, and the motives each and all the parties thereto had in mind, and the purposes they intended to accomplish by their execution.

W. H. Gallagher, the cashier of the Osage Valley Bank of Warsaw, a witness for the appellant, testified that he was the friend of all the parties to the suit and consulted frequently with all of them regarding the matters involved, and drew the contracts of May

21, 1908, and November 15, 1909, at the request of the parties.

The substance of his testimony follows:

These parties began consulting with me in 1906. I consulted with the whole family; Mrs. Wilson, Miss Anna, Miss Katie and Henry. Do not remember the first time they consulted with me. We had a great many; they were in my office many times, and I was out at their farm twice.

I represented all of them, none in particular; all equally.

Miss Anna had the responsibility of matters on her hands, and she probably did most of the talking. I was trying to help them in the matter, to adjust the matter satisfactorily among themselves on the farm, in order that they might pay off the encumbrances and keep the place. The first time they came to consult me they were trying to adjust the indebtedness, so that it could be paid off, and save the home; I thought there was a very small margin in the proposition for them.

They consulted me before the money was borrowed from Mr. Davis. The indebtedness had to be met and Miss Anna borrowed the money for that purpose from Mr. Davis.

They had a conference in my office in which they tried to arrange for their working the farm together, and pay off the debt. That matter was fully discussed between them a number of times. At one time while I was at the farm a question came up about the live stock the various members of the family owned, and there was some disagreement over the matter; but after the mother, the sisters and I discussed the matter they all agreed that Anna should buy the stock and assume the obligations of her mother and sister. She was to give them her notes for the purchase price of the stock and secure the same by a second deed of trust on the

land. It was also discussed between all of them regarding Anna's conveying back to her mother and sister a two-thirds interest in the farm subject to the $4000 she was to borrow. Mrs. Wilson, Anna, Katie and Henry were all present and participated in all of these discussions, and in my opinion, understood everything that was said and done.

All of them agreed to the arrangement. Mrs. Wilson was · just as desirous that this arrangement should be made as were the others. She insisted that she wanted writings to show definitely what her interest in the farm was to be, and said that her money was invested there, and wanted something to show for it; "because she didn't know whether Miss Anna would give her anything if she didn't have it."

These discussions occurred frequently in my office and twice down on the farm. Mrs. Wilson never said anything to me definitely about the arrangements they had when she deeded the land to Anna, a year or so previous.

I drew the contract of May 21, 1908, at their request, after the matters had been thoroughly discussed and agreed to by all parties, as previously stated. Made a rough draft of it down on the farm, and I took it back to the office and there drew it as it now appears. It was signed by all parties in my office. The contract, as finally drawn, was thoroughly discussed by and between all of the parties, and was read to and fully explained to all by me, before it was signed.

After the execution of this contract all the parties returned to the farm and worked together until the fall of 1909. In September of that year "Mrs. Wilson and Katie came to my office, and Mrs. Wilson was worried again about the matters there." And she told me that if she could get her money that she had in it she would like to go away; that she couldn't live in peace, and things weren't going according to her idea

of the way the farm ought to be run; and she wanted her money so that she could buy her a little home and get away from there, and asked me to take it up with Miss Anna, which I did.

"Q. Well, then, what was done? A. Well, they came then into the office, and arrangement was made to get the money to pay these two amounts [$841 and $794 mentioned in contract of May 21st]—Mrs. Wilson and Katie—and a contract was entered into that day, providing for its payment on the 1st day of December. [The contract here referred to was the one dated November 15.]

"Q. Is that this contract here, marked Exhibit B? [The contract of November 15, 1909?] A. Yes, that is the contract that was entered into.

"Q. Well, now, who came in when this contract was drawn? A. Well, the three ladies were here and Mr. Call was present.

"Q. Who is Mr. Call? A. Nicholas Call is a farmer living out just this side of Cole Camp Creek, near Edmonson.

"Q. Well, what was he doing there? A. Mrs. Wilson brought him along to adjust the matter, and see that everything was in shape, I presume.

"Q. Well, was he present at the time this contract was executed, and take part in the discussion of its terms? A. He was, and talked a little in the matter about the arranging of the contract; he was representing Mrs. Wilson in this matter.

"Q. Were the terms of that contract here read to her, in her presence, and in Mr. Call's presence? A. They were.

"Q. And agreed to by her? A. Yes, sir.

"Q. Well later there, at the bottom of that contract, is a receipt for the money, purported to have been paid?

"By Judge Longan: We admit getting the money.

"Q. Well, was Mr. Call present on that day? A. Yes, sir, he was.

"Q. Was that read over to Mrs. Wilson, and was it read over and explained to her? A. Yes, sir, it was explained to her by Mr. Call, too.

"Q. Did you tell Mrs. Wilson at that time that that was just a receipt for this money, and didn't affect the land, or her interest in the land? A. No, sir.

"Q. Was there anything of that sort said in her presence? A. Nothing whatever.

"Q. Was it fully explained to her that it was a full release of all her rights and claims to that money, personal property and these notes on the land? A. Yes, sir, that relieved her entirely; she give peaceable possession of the property.

"Q. Well, what did she say, when she first came in, what did she say about it? A. She told me, as I stated, she wanted her money, she wanted to get away.

"Q. Now, do you remember the amount, Mr. Gallaher, of a note that Louis Wilson and Rebecca had at your bank that were settled at the time—same time these Lincoln Bank notes were settled? A. Yes, sir, $125 and some interest.

"Q. Well, have you any personal knowledge of the fact that there were some notes paid at the Bank of Lincoln—to the Bank of Lincoln, at the same time? A. Yes, sir.

"Q. That were not included in the suit that were settled, were they paid at your bank? A. I am not sure, I don't know.

"By Judge Longan: What is the purpose of that?

"By Mr. Jackson: To show that indebtedness was paid off; it is part of that four thousand dollars.

"Q. Do you know what was done with the $4000 that Anna borrowed on the place, from Mr. Davis? A. Took up these encumbrances, I think, drawed out the money, I think.

"Q. And the notes that have been sued on, and that were embraced in the deed of trust that was given to Mr. Henry Lay, they were settled, were they, out of that $4000?

"By Judge Longan: That is admitted.

"A. Yes,—yes, sir."

Nicholas Call, witness for appellant, testified that he was requested by Katie Wilson to go to Warsaw on November 15, 1909, for the purpose of assisting her and her mother in making a settlement of their matters with the appellant, Anna Wilson; that in pursuance to said request he went and was present at Mr. Gallaher's office during the negotiations that took place between the parties leading up to the execution of the contract dated November 15, 1909; that the discussion was principally between Mr. Gallaher, Miss Anna and Miss Katie, and that Mrs. Wilson and he were present and heard all that was said and done, and occasionally each of them would ask a question or make some remark regarding the matter, in order to make the transaction plainer.

He also testified that in so far as he could observe all the parties understood what was said and done, during the conference; and that as he understood said contract, it expressed the agreement of the parties.

"Q. What, if anything, did you say to Mrs. Wilson about that; before it was signed? A. Regarding this paper?

"Q. Yes. A. Well, now, I didn't talk directly to Mrs. Wilson; but I done my main talking to Katie Wilson; I told them, and I—

"By Judge Longan: Told who? A. Well, they were both present; but I done my main talking to Katie.

"Q. Well, now, what did you tell Katie in Mrs. Wilson's presence? A. I told them I would explain that to them the way I understood it, and have them use their judgment about it: I told them the way I understood it, if they took that, they cut themselves loose from anything any further, but for them to use their own judgment whether they done that or not; that I wouldn't say.

"Q. Did you say anything about the land? A. I don't know that the land was exactly mentioned; but I had reference to the land.

"By Judge Longan: We object to that, if the court please—what he had reference to—just state what you said.

"By the Court: Yes; objection sustained.

"Q. Was the contract read in their presence? A. Read in their presence?

"Q. Yes. A. Yes, sir."

Then follows a somewhat extensive examination regarding the negotiations leading up to the contract, and its execution, which in effect corroborated the testimony of Mr. Gallaher in all material respects.

The appellant testified that she was a daughter of Mrs. Wilson, the respondent; that when she was thirteen years of age, her mother sent her from home to work, first to Mr. Mueller's. That she never lived with her mother very much after that. The longest time was two months, when she had "typhoid pneumonia." That she never received any assistance from her mother for support or education, nor from anyone else; earned everything she has.

"Q. Now, you may tell the court the history of this deed that your mother made to you; why it was done; just go on and detail the story as you recall the different steps; why you came home at the time the deed was made, what your point was in coming, how you happened to be there; just give the court the history of it; in your own way? A. My mother wrote me to come home. When I came home, she related her condition to me, and asked me to assist her in the matter and then referred to giving me this deed provisionally, and if I would accept the deed in that way, and try to get a loan on it, as large a loan as possible, or to dispose of the land by sale, and—

"Q. Now she related her trouble: what was the trouble? A. That she had signed a great any notes for brother Louis, for which she would be liable for."

Then follows a somewhat extensive examination of the witness regarding certain facts that are alleged to have existed at the time of the execution of the deed in question, which it is claimed were fraudulent; since, however, they have but little, if any, bearing upon the issues of this case, there is no use of mentioning them in detail here. (But in passing, I will add that this is the reason why the evidence in this case regarding the execution of the deed is so meagre; but as previously stated, this question having been found against the appellant by the trial court and confirmed by this court in paragraph one of the opinion, it is not necessary to press it further).

"By Mr. Owen: Tell what she said. A. Well, that is what she said: and then I suggested to come to Warsaw to make the deed, and she said, no, that the lawyers weren't friendly to her at Warsaw; that Louie had employed them; that she wanted to go somewhere else; and asked me if I knew any lawyers at Sedalia, and I told her that I did. I was acquainted with lawyers there too, and she suggested going to

Sedalia and making the deed. Then we made a trip to Sedalia, and the deed was made in Mr. Barnett's office.

"Q. Well, what did you say to your mother about making the deed? A. I told her that I would do what I could in the matter, and so tried to take care of her the best I could, but of course, as to me influencing my mother, anyone that knows the family at all, would know—

"By Judge Longan: I object to that.

"A. Well, I never had any influence with my mother whatever."

Then follows a detailed account of the new complications that arose when Louis Wilson failed in business, the bringing of the attachment suits, previously mentioned, and the result thereof; also an account of how she tried to borrow the money from various persons on the land with which to pay the debts of Louis Wilson, for which her mother was security, and finally borrowing $4000, from Mr. Davis for that purpose and paying the debts, etc.

Then follows a detailed account of how she was to be secured or indemnified against loss, etc., which is in all material respects in perfect harmony with the testimony of Mr. Gallaher and Mr. Call, previously set out.

There were several other witnesses introduced by appellant who testified to certain facts and conversations had with the parties which tended to corroborate the evidence of Gallaher and Call.

The evidence for the respondent was introduced, not for the purpose of showing that the deed of March 3, 1906, executed by her, conveying the farm to Anna, and that the contracts of May 21, 1908, and November 15, 1909, were not executed by her, or that the contracts were not discussed, drawn up, and executed as Mr. Gallaher testified, but for the purpose of showing that she did not understand the discussions had be-

tween the parties regarding the matters, and the meaning of said contracts as drawn and executed.

She testified that she was at the time mentioned sixty-nine years of age, and came to Benton county from Germany in the year 1858; and in order to show her understanding of the English language and business transactions in general, as well as these under consideration, I will here set out certain parts of her testimony.

"Q. Who has been living with you on the farm since your husband's death, in 1888? A. Louie was the biggest part of the time.

"Q. How long did he live there—when did he leave? A. Now he left in 1906.

"Q. When? A. If I ain't mistaken it was now about four years ago; I believe.

"Q. Had he lived there on the farm all the time since your husband's death? A. No, he lived a short time on another farm; I guess he raised another crop on the other place—his wife's place.

"Q. During the time that Louis lived on the farm, was he in business any place else? A. Yes, sir, he had a store.

"Q. Where was the store? A. Edmonson.

"Q. How far is Edmonson from your home place —home farm? A. Adjoining the forty—the same forty where my—

"Q. Your name is Rebecca Wilson? A. Yes, sir.

"Q. You are the plaintiff in this case? A. Yes, sir.

"Q. How old are you, Mrs. Wilson? A. A little over sixty-nine years—going on seventy years.

"Q. How long have you lived in Benton county? A. Since the year 1858.

"Q. Where were you born? A. In Germany.

"Q. When did you come to this country? A. 1858.

"Q. Where do you live now, Mrs. Wilson? A. In a couple of miles of Edmonson, in this county.

"Q. Where do you live now? A. Near Edmonson.

"Q. How far is that from Warsaw? A. About twelve or fourteen miles.

"Q. Do you live on a farm or in town? A. Farm.

"Q. How many acres is there in that farm where you live? A. Well, what is my farm, is 159.

"Q. How long have you lived there on that farm? A. Since the year 1867.

"Q. Are you a widow? A. Yes, sir.

"Q. When did your husband die? A. In 1888—twenty-two years ago.

"Q. How many children have you, Mrs. Wilson? A. Six.

"Q. How many girls and how many boys? A. Three boys and three girls.

"Q. Just give the names of those children, according to their ages and the way they were born? A. Well, Louie, he was born in 1868.

"Q. I don't care about just when they were born, but how old are they—who was the next one? A. Henry in 71; born in 1871.

"Q. Who was the next one? . . .

"Q. Up to the time that he left the farm, and you think it was in 1906, who managed your farms and your business, and looked after the business? A. My son-in-law was there until this trouble came up; my son-in-law worked on the farm.

"Q. He worked on the farm? A. Yes, sir; he had it rented.

"Q. Did Louis, when he lived on the farm, did he have anything to do on the farm? A. He had it

rented ten years; when his time was up, then my son-in-law took it.

"Q. When was his ten years up? A. I have forgotten—couldn't tell exactly; I guess about 1903.

"Q. Then after that your son-in-law, what did he do—did he have it rented? A. Farmed and rented.

"Q. Now, what did you do, Mrs. Wilson; tell the court, with reference to running the farm and managing it? A. Well, I went on the farm and tried to help along; everyone what was working on the farm.

"Q. Who transacted your business for you, if you had any—did you have any stock or things like that? A. Not, now, I did have.

"Q. Well, who looked after the selling of your stock and business of that kind? A. I had it rented out until this trouble come up; I done it myself.

"Q. Now, which is your son-in-law—what is his name? A. Bailey Stone.

"Q. How long did he have the farm rented? A. I guess he had it four years—I ain't certain.

"Q. Just tell the court whether you signed any papers for your son Louis, or not? A. For my son Louis?

"Q. Yes. A. I did; signed several notes.

"Q. Do you know how much they amounted to? A. Well, I at first didn't know; I think one about sixteen.

"Q. Sixteen what? A. Sixteen hundred; but after they all came in, it was over thirty hundred.

"Q. Over thirty hundred? A. Yes, sir.

"Q. Now, Mrs. Wilson, where has your daughter Anna, the defendant here, lived the last ten or fifteen years? A. I couldn't exactly say; she was on her own business; part of the time in Kansas City, and some northern counties there.

"Q. When did she leave home? A. Well, about ten or eight years ago; I don't know exactly."

Then she testifies as to the disposition of appellant and the manner in which she was treated by her.

After stating that Louis had failed in business and that she had been called upon to pay the notes she had signed for him, and was unable to do so, she testified:

"Q. How long would she (Anna) stay home when she came? A. Sometimes a short time, and sometimes a couple of weeks.

"Q. How was Anna's treatment toward you when she would come home during these trips? A. The first time she was tolerable—I could stand it.

"Q. How has Anna's treatment been of you up to the time you signed this deed—how was it? A. The last time it was tolerably good.

"Q. Well, did she—how large a woman is Anna; what sized woman is she?

"By Mr. Jackson: That is before the court; he can see her.

"By Judge Longan: I want the record to show just the character of the parties.

"A. I don't understand whatever you mean.

"Q. Well, is she a large, healthy woman? A. Yes, sir; yes.

"Q. What kind of a disposition has Anna? A. That is what about—I don't understand what he means.

"Q. What kind of a nature—good natured and kind? A. Good sometimes, and then just like lightning she will change.

"Q. When did these debts you signed for your son, Louis—when did they become due? A. What?

"Q. About when did these debts you owed for Louis become due? A. Well, somewhere—some of them in 1800.

"Q. 1900, you mean? A. Yes, about 1802 or 1803.

"Q. 1900, you mean? A. Well, some of them were pretty old and renewed again and fell due in 1905.

"Q. Well, now, in the spring of 1906? A. That was the time it all got crowded in—that Louie left.

"Q. What condition was Louie in at that time—financially? A. Well, he got all of his property off his hands; he didn't have any property on hands any more.

"Q. Could he pay these debts? A. Not the way like he had it there.

"Q. What became of Louis? A. He worked in the depot, I hear, over there at Sedalia.

"Q. Did the people to whom these debts were due—did they look to you and come to you for money? A. Yes, sir.

"Q. That was in the spring of 1906? A. They did—yes. . . .

"Q. When did you try? A. Why, I did try just about the time when Louis—just a little before Louis tried to get work.

"Q. Well, did you find anybody that was—any money? A. No, sir.

"Q. Where was your daughter Annie at that time? A. The biggest part of the time, I think, she made her home Kansas City.

"Q. Did she come home in the spring of 1906—in March? A. Yes, she come home—I told her.

"Q. Do you know why she came home? A. I don't know; if I ain't mistaken she had Louie's girl along, and she brought that along—I ain't certain.

"Q. Well, when she came home were these debts troubling you then? A. Yes, I got troubled; my mind got to thinking a lot how I was to get out of them.

"Q. How you would pay them off—how you would get the money? A. How I would get the money.

"Q. How you would do what? A. How I would get on with them—how I would commence with them, and how to get the money.

"Q. Well, when Anna came home did you tell her about these debts? A. Yes, sir, I told her about it.

"Q. Just tell the court now what you told her? A. I told her about it—that I would get in trouble on account of I signed the notes for Louie; and I didn't know how I would get at it; so she got to talking that she would help me.

"Q. Just tell the court all that she said? A. She could help me, if I would do what she wanted me to do, and if I could trust her, had confidence in her, she could help me. Well, there was some rich farmers out there that she was used to in that country where she was from, and she must have—I must have confidence in her and trust in her, like other people did; she helped others and she could help me. Well, at first I didn't know how I would 'so she—that other people trusted her, and had confidence in her, and her old mother wouldn't do it—If I would do it, that she could help me; and she must have something in the hand to show what on. . . .

"Q. What did she want you to do? A. She wanted me to give her a deed—let her hold the deed.

"Q. Deed to what? A. Warranty deed—good deed to the land.

"By Judge Longan: The deed should be admitted now. I suppose it could be admitted that there was a deed given by the plaintiff, Rebecca Wilson, to Anna Wilson?

"By Mr. Lay: Yes, sir, we will—the deed, you have it in the petition.

"Q. Well, then, what did she say she would do— if you would put it in her name, about these debts? A. She would try and get money; she had a little money;

had some money in the bank in Kansas City and some somewhere else, and she would try to get some money there, to put it in there.

"Q. Well, what was it you said awhile ago, about there being some rich people—farmers? A. That would trust her more when she had a deed and she could get it.

"Q. How is that? A. When she had something to show for it, like a deed, then she could get the money.

"Q. Get what money? A. For the—get a loan on the land.

"Q. What did she want to get a loan for? A. To pay the debts off, on the land.

"Q. Pay what debts? A. The debt on my farm, on them notes that I signed.

"Q. The notes that you had signed for Louis? A. Yes, sir.

"Q. Well, what did she say further about getting the money on the farm to pay the debts? A. Well, she tried to get the money, to get a loan on that, and then she did; and she got a couple of farms in besides mine when she took the whole business of Louis—

"Q. Well, we don't want that yet—what did she say to you at the time—before you made the deed now, when she was talking to you about making the deed— what did she say she would do after she got the deed? A. After she had the deed she would try to get the money, and hold the deed until she got a loan.

"Q. Then what would she do? A. Then she would go and pay the creditors, and when she could get a good loan on the land she would come and turn the deed over to me; it wasn't her place for her to stay at—she could do better at her business.

"Q. That she would deed it back to you when she got the loan? A. Yes, sir, when she had the loan.

"Q. And the creditors paid—when the creditors, were paid, she would deed it back to you—that it? A. Yes, when the loan was made on there—after the loan was made on the land; after five or ten years or a long time, then she would turn it over to me again.

"Q. Do you mean turn the deed over, or that she would deed the property back to you? A. Yes, that is what she had been telling me a dozen times, on the road.

"Q. Well, what did you do, with reference to making the deed? Did you make the deed? A. Yes, sir, the deed was made.

"Q. Now, where did you go to make that deed? A. In Sedalia.

"Q. How did you come to go to Sedalia; tell the court all about that? A. Well, she wanted to go back, she had to go back to Kansas City again, and she was in a hurry, and going back, and she had good friends; several good, well known law-mans there to make the deed.

"Q. Where was that? A. At Sedalia.

"Q. Did she say anything about coming to Warsaw? A. Yes, sir, coming to Warsaw, but she didn't want to come here; she didn't know the lawyers up here, and didn't—

"Q. When did you go to Sedalia—what time in the day, and how? A. Well, we got there with the train, there about as they were; it was nearly night when we got there.

"Q. What did you do, anything, in Sedalia? A. Just as quick as we got there we went right into a lawyer's office to make the deed while she was in a hurry and wanted to get off.

"Q. Whose office did you go to? A. Barnett.

"Q. Now, just tell the court what she said to Mr. Barnett about this deed? A. Well, she done the talking; I didn't talk very much; but then, I had to

do the way she wanted me to do to be helped; so I told him I wanted her to hold the deed; but he had nothing to say.

"Q. Where did she go? A. Kansas City.

"Q. Tell what Anna said to you before she went to Kansas City—about getting the money and the loan on the farm? A. She says just as quick as she can get the loan on the farm she would turn it over to me again, and she tends to her business and I have to tend to the farming business, she would get out of it.

"Q. Did she say anything about getting the money when she went to Kansas City? A. Yes, she would try to get the money of them rich farmers there.

"Q. What did she say to you about that, before she went to Kansas City? A. Well, if she got the loan she would turn the deed' over to me again.

"Q. Well, just tell what she said, if she said anything? A. Well, she say I must be quiet and good and not worry myself in good hopes we would get out all right if I would; just to do like she wants me to do; she talked awful lovely to me.

"Q. Well, when did you hear from her again? A. About a week or so, she—I guess she wrote a letter.

"Q. Did she say anything about the money in the letter? A. I don't know; I can't read writing—American.

"Q. You can't read American? A. No.

"Q. Well, when did she come home? A. Well, I guess a couple of weeks after.

"Q. Just tell the court what she said about the money when she came home. A. Well, she couldn't get it; didn't get the money—she talked awful lovely to me, and didn't get the money there that time, and wants me to look around for money, too, and wants to get money somewheres out here.

"Q.  Well, how long did she stay home that time?
A.  Not very long; maybe a day or two—some time.

"Q.  Just tell the court where she went then?
A.  She went back to Sedalia—to Kansas City, as well as I know, to her business, in North Missouri, somewheres.

"Q.  When did she come home again, Mrs. Wilson?  A.  I don't know exactly, maybe a month or two afterwards; maybe a shorter time; I couldn't say for certain."

The witness then proceeds at some length, detailing how lovely the appellant treated her before she received the deed and how unkind thereafter; and that after failing to get the money in Kansas City, appellant went to Mr. Davis of Benton county and borrowed the $4000, and secured the same by a deed of trust on the land.

From that time forward her testimony does not materially differ from that of appellant, only as previously stated, she testified she did not understand the consultations had between herself, Anna, Katie, Henry and Mr. Gallaher, leading up to and culminating in the execution of the two contracts previously mentioned, drawn by Mr. Gallaher and signed by all.

Katie Wilson's testimony was practically the same as that of her mother.

Respondent introduced other evidence, but it differed in no material manner from her own.

While we defer somewhat to the findings of the trial court in equity cases, which has the advantage of seeing the witnesses, hearing them testify and observing their conduct and demeanor upon the witness stand, yet after carefully reading the evidence and considering and weighing the same as we have done in this case, which in our opinion does not warrant the findings and decree of the court, we reserve the right to make a finding of facts for ourselves and render

such a decree as justice and equity in the premises demand.

This is the ancient and well-established doctrine of this and all other courts having appellate jurisdiction in equity cases.

After a careful consideration of this entire record, we are unable to discover any fraud whatever perpetrated by the appellant upon the respondent.

There is no dispute whatever as to the facts thereof, but the contention of respondent is that she did not understand the facts—that is, she did not understand what was said and done during the numerous conferences that took place between herself, Anna, Katie, and Henry, all her children, and Mr. Gallaher, the friend and counselor of all of them, that resulted in the execution of the contracts of May 21, 1908, and of November 15, 1909.

After a careful consideration of the evidence I am unable to lend my approval to that contention. While the evidence shows the respondent could not read English, yet her own testimony, as taken down *verbatim,* shows she not only understood it remarkably well when spoken, but also that she spoke it quite fluently regarding the ordinary affairs of life and especially regarding this entire transaction from its inception down to the date of the trial of the cause in the circuit court.

If Anna intended to defraud her mother, then it is inconceivable why she, under the advice of a shrewd business man, would have entered into the contract of May 21, 1908, by which she purchased the live stock on the farm from her mother and sister for $1635, and secured the same on the farm by a second deed of trust, and then conveyed back to them a two-thirds interest in the land, subject only to the $4000 deed of trust, with the further agreement that all three of them should live upon the farm and cultivate it, and out of the net profits thereof the $4000 was to be paid

off and discharged, thereby leaving them two-thirds interest in the same free and clear of all incumbrances, and the one-third interest of the appellant therein incumbered by the second deed of trust for the $1635.

Should it be conceded that the farm was fully worth $7000, the amount charged in the petition, appellant could not have defrauded the respondent and Katie out of any considerable amount for the simple reason the equity, or the value of the farm over and above the $4000 deed of trust, would be but $3000, two-thirds of which $2000 was reconveyed to them by the deed held in escrow by Mr. Gallaher, under the terms of said contract, leaving only $1000 balance to represent appellant's $1871, which said contract shows she had at that time invested in the farm.

View this record from whatever standpoint you may, I am wholly unable to see any bad faith, or fraud in fact or law, perpetrated by the appellant upon the respondent or anyone else.

But concede for the sake of the argument that the equity in the farm was worth the full $1000 to appellant at the date the second contract mentioned, November 15, 1909, was executed, yet the respondent, in the absence of fraud, of which there is not a scintilla of evidence in this case, should not be permitted to recover. The conditions of the parties had under the contract of May 21, 1908, completely changed, and appellant, upon the faith thereof, had purchased other property and assumed additional obligations which she otherwise would not have done, to say nothing of her release of the respondent and Katie from their contract agreeing to live upon the farm and assist in its cultivation until the net profits thereof would pay off and discharge the $4000 deed of trust thereon. This contract was willingly entered into by respondent, and the uncontradicted evidence shows that it was drawn up and executed at her instigation and request, and

that she was fully advised of its contents by Mr. Gallaher and her own chosen friend, Mr. Call.

III.   There are other grounds assigned for a reversal of the judgment of the circuit court, but the view we have taken of the case dispenses with the necessity of passing upon them, though meritorious they may be.

Entertaining these views we are of the opinion that the judgment of the circuit court should be reversed, and the bill dismissed.   It is so ordered.   All concur.